# ZEMAN & WOMBLE, LLP

KEN WOMBLE                                          P  (718) 514 - 9100
20 VESEY STREET, RM 400                             F  (917) 210 - 3700
NEW YORK, NY 10007                        WOMBLE@ZEMANWOMBLELAW.COM
                    WWW.ZEMANWOMBLELAW.COM

                                                    January 28, 2021

**BY ECF & EMAIL**
Hon. J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

### Sentencing Memorandum on Behalf of Mario Ramos
#### *United States v. Mario Alberto Ramos*, 20 Cr. 29 (JPO)

Fear is an incredible motivator.  Credible fear of harm to himself and his family drove
Mario Ramos to become a drug courier.  This immigrant, father and husband, a man who followed
the law and maintained a simple life, was thrust into a role he neither contemplated nor wanted.
Fear of disappointing his family meant that Mario kept this dark secret from everyone except his
fellow courier, Carlos Ramirez.  Although both Ramos and Ramirez were paid the same amount
for their services, it was Mario who was the point of contact for their bosses.  It was Mario who
felt he had no other option but to agree to their terms, to not test the veracity of their implied and
explicit threats.

Ramos assumed that this horrible chapter would end in either violence or arrest, and when
that day arrived, he was relieved that it was the latter.  He had never been arrested before and had
no concept of what jail would be like.  At 59, with a host of medical conditions, the last year and
a half has been the most difficult time of his life.  Mario has had to survive through the COVID
pandemic, experiencing the constant grip of fear in the MDC, where 241 inmates have 'recovered'[1]
from COVID while 43 inmates are currently testing positive (75 staff have 'recovered' with 29
staff currently testing positive).  The BOP's only significant response to the pandemic has been to
quarantine its jails and prisons from the outside world and to institute onerous lockdown conditions
inside.  Inmates have been cut off from their families and have been forced to spend days on end
inside their tiny cells.  Although all lives have changed considerably over the last year, life for
someone like Mario Ramos is almost impossible to imagine.  Without the ability to adapt to
increased sanitation routines or social distancing, Ramos, almost 60 with chronic hypertension,
has lived with an acute sense of dread of catching the virus that has killed over 450,000 Americans

---

[1] The BOP uses the term "recovered" to indicate merely that an inmate who has previously tested positive for COVID
is no longer testing positive and has not died.  This label ignores the permanent health damage that an unknown
number of inmates have incurred.

and is currently taking well over 3,000 lives per day.[2]

The fear of death and of spending even one extra day in the hellhole of the MDC or his designated facility has been immense for Mario. However, throughout this case, he has lived with an even greater fear. Since he was arrested, he has lived in constant fear that the people he worked for would bring retribution upon his family. The Government has clearly and consistently offered Mr. Ramos the opportunity of a safety valve proffer. Mr. Ramos and I have spent untold hours weighing the various tangible and intangible pros and cons of such an option. Despite facing years in prison, Mr. Ramos has never been willing to bargain his own freedom for his family's potential safety. The veracity of the prospective threats are immaterial. Mario has been steadfast that he would not place his family in harm's way because of his decisions.

The Court has before it a first-time offender who transported drugs for others. Mario had never even heard of 'fentanyl' prior to his arrest. He, just like his co-defendant Ramirez, knew that he was transporting drugs and assumed that those drugs were cocaine. Mr. Ramos lived in fear since the moment he was pulled into this conspiracy. He has overcome that fear by making the brave decision to trade his own freedom to ensure his family's safety. Mr. Ramos was compensated for his crimes, but in equal amount to his co-defendant, who was recently sentenced to 18 months incarceration and is set to be released in March of this year. Despite a guideline range tailored for those who controlled this conspiracy and a range of incarceration that utterly fails to account for these unprecedented conditions of confinement, a mandatory minimum sentence of 60 months would be "sufficient but not greater than necessary" to achieve the ends of justice under 18 U.S.C. § 3553(a). Such a sentence, almost three times greater than that of the person sitting in the truck right next to Mario, would properly punish his crimes while avoiding unwarranted sentencing disparity. A sentence of 5 years, as recommended by the Probation Department, would credit the immense human struggle that formed his decision to remain quiet and accept his fate, as well as the unprecedented and onerous conditions of his confinement.

## I.     The First 55 Years of Mario Ramos' Life

Mario Ramos grew up without a father in Guadalajara, Mexico.[3] Impoverished like so many around him, Ramos lived in a one-bedroom home with his mother and five siblings.[4] Young Mario chose work over school at age 7. He delivered newspapers and ran errands for neighbors to make a few pesos here and there and help his family survive. His siblings attended school while he worked, a fact Mario does not begrudge them. In fact, he is happy that they were able to receive the education he did not.[5] Over the course of his life, he overcame his lack of education with an intense and devoted work ethic.

As Mario began working more consistently, he moved out from under his mother's protection. The world exacted cruelty upon him in his youth, taking an emotional toll that still

---

[2] https://coronavirus.jhu.edu/data/cumulative-cases
[3] Pre-Sentence Report ("PSR") ¶ 45.
[4] PSR ¶ 47.
[5] PSR ¶ 49.

impacts him to this day.[6]  Essentially on his own and supporting himself as a teenager, Mario and his girlfriend, Betty Camarillo, had their first child, Mario Jr.. Mario Ramos Sr. was just 16 years old.  Two years later, after the birth of their second child, the teenage couple separated.  Barely in his 20's, Mario had two more children, a daughter and a son with Piedad Gonzalez, before that relationship ended as well.  Mario reconnected with Ms. Camarillo and the couple had their third child.

Still in his early 20's, Ramos fathered another child with a short-term girlfriend.  Mario recognizes the parallels between his own absent father and his children in Mexico.  He has made sure that he always had a job so he could support his children.  The young man sold fish at the beach, washed cars, painted and cleaned houses, worked as an assistant carpenter and also worked as a traffic cop.[7]  Throughout his life, he has never stopped working and has made sure to support and stay in his children's (and now grandchildren's) lives.[8]

His rambling young life finally found stability when he met Maria, his current wife of 34 years.  The couple married in Puerto Vallarta, Mexico in 1987.[9]  Mario started his own T-shirt printing business and in 1989, Maria was pregnant with their first child.  After Carlos was born, the family made the decision to strike out for a better life in America.  In 1990, the young family settled in Long Beach near L.A., in the same home where his wife still lives.  Mario immediately found a job as a dishwasher, making minimum wage (at the time $4.25) but working enough hours to support his new family.[10]

In 1993, Mario felt like he struck gold when he found work at All Pro Fence Company, making $25 per hour as a full-time laborer.  This new job could not have come at a better time, as the Ramos' family had a new son, Rafael.  Eight years later, they would have a daughter, Marisol.  Mario worked diligently for the same company for the next 12 years, only getting laid off due to lack of work.  Rhonda Moore, the owner of the company, valued Ramos as a "dependable, hardworking" employee who "worked well with others."  Ms. Moore said that if Mr. Ramos asked, she would hire him again.[11]

Mario found work as a chauffer after leaving All Pro Fence,[12] and in 2005, he and Maria obtained status in America as legal permanent residents.[13]  In 2006, Mario got the opportunity to drive commercial trucks, driving for various companies until he was hired to drive tractor trailers for Ram-Kath Logistics, Inc., co-defendant Carlos Ramirez' company.[14]

---

[6] PSR ¶ 50-51.
[7] PSR ¶ 77.
[8] A number of Mr. Ramos' children in Mexico (Mario Jr., Alfredo, Javier, Magali) wrote letters of support on his behalf, submitted as Attachment A.
[9] PSR ¶ 54.
[10] PSR ¶ 76.
[11] PSR ¶ 75.
[12] PSR ¶ 74.
[13] PSR ¶ 60.
[14] PSR ¶ 72-73.

## II.     Nature of the Crime

The Government and Court are well-aware of the scope of this drug conspiracy and Mario Ramos' role as a courier within it.  Just like his co-defendant, Mario was a truck driver by trade. This made him a perfect target for those who wanted their drugs transported from the west coast to the east.  They approached Mario and made him what can only loosely be described as an offer. With only bad options before him, Mario chose the one that he thought had the best chance of keeping him and his family safe.

Over the course of the conspiracy, Mario Ramos did what he was told.  As the sheer volume of letters in support show,[15] Ramos was respected in his community and loved by his family and friends.  Mario, a young Mexican immigrant who came from nothing, took great pride in the family and circle of friends he had built both here in America and back in Mexico.  But these were then the same people that would be in danger if he refused to transport drugs.  Having no intention of finding out if their threats were legitimate, Mario did what he was told.

Although the Ramos family has never owned a home, Mario always considered his payment 'dirty money' and kept his secret life just that – a secret.  One motivation was shame. The other was protection.  He knew he had no answers if his wife or son asked where this extra money came from and Mario knew that being honest with his family or friends could endanger their lives.  Mario developed a gambling habit in order to offload the drug money.  He understood the perverse morality of his decisions, but did what he thought was best for his family in light of his impossibly limited options.  When arrest finally found him in New Jersey toward the end of 2019, Mario initially felt a sense of relief that he finally had a way out of his double life.  That relief, though, turned to dread when he had to come to terms with the danger that still lurked from his now-former employers.

## III.     Incarceration During COVID

Our country incarcerates far too many people for far too long.  Along with world-beating frequency and length, the standard conditions in America's jails and prisons are embarrassing, dehumanizing and counter-productive the stated ends of justice.  Facilities like the MDC seem almost designed around an ideal of destructive punishment, removing all joy or compassion from within its walls.  This is not a criticism of the efficacy of incarceration, but a critique of how cruelly our country implements it.

Mario Ramos settled into his new life in jail by developing a reputation as a quiet older gentleman who kept to himself.  He quickly got a job in the kitchen and works as often as he can, between 5 and 7 days a week.  He follows the rules and has not had even a whiff of an infraction. Despite making the best of a bad situation, after only a few months in jail, he sat at the precipice of the pandemic that would drastically alter society and turn the entire MDC into one big SHU (special housing unit).  When he is not working in the kitchen, Ramos has been confined to his cell for often 23 hours of the day (or more when his unit has been on full lockdown).

---

[15] Letters of Support, Attachment A

The abstract concept of incarceration was brought into painful detail for me in 2019 when I toured the MDC and got to see what qualifies as a cell. Three features of the room hit me as soon as I walked inside. First, the centerpiece of the room is an open, stainless steel toilet protruding from the wall opposite the door. The conspicuous placement of the toilet shreds the dignity of the cell's inhabitants all because of some misapplied concept of security. Second, the massive size of the jail facility is in stark contrast to the miniscule living quarters inside. Standing inside a cell that 'houses' two people, a person can simultaneously touch opposing walls with outstretched arms. The metal bunks take up almost half of the entire room. And it is these bunks that hold the third aspect of MDC cells that shocked my conscience. Atop each bunk was a single blanket, similar to the free one a person receives on an airplane. That inadequate covering sat atop a decrepit, thin, plastic-covered mattress. It was disturbing to see with my own eyes that our government forces human beings to sleep with nothing between them and the flat metal bunk except a mattress I would expect to see left on the street for garbage pickup. At a certain point, one must wonder if reducing an inmate's humanity is a bug or a feature.

As I write this during an immense snowstorm, I am also reminded of the consistent complaints I receive from clients like Mr. Ramos during the winter months. The facility is freezing and the inmates are not provided with sufficient warm clothing. When the COVID pandemic hit last year, the endemic problems in the MDC were exacerbated. Along with cold cells and cold food came another difficult symptom of the lockdowns. The few things that made life somewhat bearable, the time to mill around in the common area, play board games or basketball, those have all but disappeared. And undoubtedly the most coveted solace in jail, visits with family, is impossible. With his family in California, Mario has been unable to see them and because of limited access during COVID, has not been able to call them nearly as often as he would like. Rolling lockdowns have meant weeks at a time have gone by where Mario has been unable to speak to his wife and children. The brief periods of time he is allowed out of his cell (usually every other day during lockdown) are often consumed by much-needed hygiene maintenance.

COVID restrictions have become standard for us all. I have not seen many friends or family over the last year, but the hardship for Mr. Ramos is of an entirely different magnitude. I have been able to maintain remote contact with my family and have been in control of the precautions I take to keep myself and my family as safe as possible. Jail does not afford the option of social distancing or adequate sanitation. Reports of officers at the MDC often not wearing masks inside the facility have been commonplace. When I hear about (and have seen with my own eyes) the indifference and sometimes malice the BOP staff harbors towards the human beings in their care, it is distressing to imagine the terrifying nature of what the last year must have been like for Mr. Ramos and so many others.

Security is unquestionably a major concern in any jail or prison. When any question on design or operation is considered, though, the dignity and humanity of inmates always seems to lose out to security. But when we wring so much dignity and so much humanity out of a jail facility, we are left with a population that is prone to despair and rage, creating a more severe and intractable security concern. If those controlling the direction of our system of incarceration

properly considered the benefits of allowing inmates to maintain hope and dignity, it would create safer, more rehabilitative facilities.  Instead, we are left with what a philosophically-minded former-client of mine called "gladiator schools."

Fortunately for Mr. Ramos, his age and quiet nature have allowed him to sidestep the simmering conflict of the MDC.  However, he has been entirely unable to avoid the frigid temperatures, the thin mattresses or being confined his tiny, depressing cell for the last year.  The horrible conditions of confinement at the MDC provides a significant basis for leniency.  Mr. Ramos recognizes that even with a reduction for good time credit, the earliest he can be released will be 2023.  He looks forward to being able to leave the MDC and hopes that he is designated to a BOP facility close to his family in Los Angeles so he can see them after the lockdowns are mercifully lifted.[16]

## IV.    Argument

The primary goal of sentencing should almost always be to create a path for a defendant's reform and improvement.  This altruistic objective dovetails with the utilitarian goal of ensuring that a defendant does not violate the law again, for society's sake.  While there is certain lawlessness or recidivism that could justify incapacitation eclipsing the goal of rehabilitation, Mr. Ramos' crimes and the context of his life certainly do not warrant incapacitation for a moment longer than is legally required.  Mr. Ramos decision to decline the option of a safety valve proffer should give this Court confidence that Mr. Ramos is well on his way towards returning to the law-abiding path he walked for the vast majority of his life.

Prior to his involvement in this conspiracy, Mario Ramos lived the life of an honest, hard-working, family man.  Upon reaching his mid-50's, he did not decide to divert course and seek out crime or any participation in the drug business.  He was perfectly content in the life that he and his family had carved out for themselves.  Had fate shifted ever-so-slightly, he would still be earning a living driving a truck and spending time with his family when he was not on the road – just like he had for the past 15 years.  However, despite the mitigating reasons, Ramos did violate the law.  This Court's charge to balance his criminal conduct with the full context of his life and characteristics is at the heart of the § 3553(a) equation.

His role in the conspiracy is almost identical to that of his co-defendant Carlos Ramirez.

---

[16] FCI Terminal Island in San Pedro, CA, is very close to where the Ramos family lives in Long Beach, CA.  Although the BOP reports very few current cases of COVID at FCI Terminal Island, it had one of the worst and deadliest outbreaks in the entire BOP system in 2020.  The L.A. Times reported on January 13, 2021:

> A new report from the Department of Justice's Office of the Inspector General paints a dire picture of problems that exacerbated a deadly coronavirus outbreak last year at Terminal Island federal prison.
> The report […] found that officials at the low-security prison in San Pedro struggled to keep inmates socially distanced and did not adequately quarantine those who tested positive for the virus, which ultimately infected more than 70% of the prison population and killed 10 inmates.

https://www.latimes.com/california/story/2021-01-13/terminal-island-federal-prison-mistakes-lead-to-covid-19-spread-inspector-general-finds

Differences aside, both men were paid the same amount for their role as a 2-man team of drug couriers. It is not disputed that Mr. Ramos' involvement in this type of criminal activity was an aberration in an otherwise law-abiding life. His role as a courier alongside the decades of simple, honest hard work favor a sentence of 60 months imprisonment.

The need to avoid unwarranted sentencing disparities also heavily supports Probation's recommended sentence of 60 months, nearly three times that of his co-defendant. Mario Ramos and Carlos Ramirez worked as a team to transport drugs across the country and they were similarly compensated. The largest difference prior to arrest is that the owners of the drugs had direct contact with Ramos. They knew who Mario was and more importantly, they knew where his family was. This fact controlled both his decision to enter the conspiracy and his decision to accept a plea with a mandatory minimum of five years.

Within the largely predictive sentencing calculation is the need to deter future misconduct. As to general deterrence, the need to send a message to others, the only people paying attention to the sentencing of Mr. Ramos are the throngs of family and friends who want him home as soon as possible. They would be receptive and appreciative of a sentence based in mercy during these unprecedented times. With respect to specific deterrence, Ramos has singularly accepted responsibility in an admirable way. He had no desire to get involved in this conspiracy in the first place and needs no deterrence. Ramos was presented two impossible options and chose the one that he felt kept his family the safest. His decision to accept responsibility in the way he has was also to keep his family safe. For someone who has worked diligently since he was a child, Mario Ramos will certainly find work upon release and with the support of his community and the love of his family, he will put his life back together.

**Conclusion**

Throughout this case, Mario Ramos was unwilling to do anything that had the possibility of placing his family in danger. He would love nothing more than to be on the doorstep of release so that he may see them again, especially his 87-year-old mother. However, he has made a difficult but commendable decision to accept responsibility for his actions and take the punishment upon his own shoulders. A man of few words, during our last conversation, he asked me to include this message to Your Honor:

> I am very grateful to this country for what it has given me. Thanks to this country, my family can live the way that they do. I apologize to this country, Your Honor and to my family. I am sorry to my family for their suffering because of me. No matter what happens, I will pray for great blessings upon this country because this is a great country. If I am given a second chance to remain in the United States, I will not fail it again.

In recommending 60 months incarceration, the Probation Department certainly recognizes the fact that the sentencing guidelines do not properly account for a courier like Ramos. A five-

year sentence will properly adhere to the sentencing factors set out in § 3553(a), especially the need to avoid unwarranted sentencing disparity.  The tangible record of very real support should satisfy the Court that ending Mr. Ramos' sentence at the earliest moment will release him into a community of family and friends that will ensure that he returns to his path as a law-abiding, hard-working husband, parent and grandparent.

Respectfully Submitted,

*Ken Womble*

Ken Womble
Attorney for Mario Ramos
Zeman & Womble, LLP